IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEVEN KELLAM, | § | |
| | § | No. 224, 2024 |
| Defendant Below, | § | |
| Appellant/Cross-Appellee, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1506014357A(S) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee/Cross-Appellant. | § | |

Submitted: February 19, 2025
Decided: May 13, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

Zachary A. George, Esquire, (*argued*), Angelica M. Mamani HUDSON, JONES, JAYWORK AND FISHER, LLC, Dover, Delaware, *for Appellant/Cross-Appellee Steven Kellam.*

Kathryn J. Garrison, Esquire, (*argued*) DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee/Cross-Appellant State of Delaware.*

**TRAYNOR**, Justice, for the Majority:

Steven Kellam was convicted in the Superior Court of racketeering, two counts of first-degree felony murder, and numerous other crimes. The court sentenced Kellam to two life sentences plus 770 years in prison, and we affirmed his convictions and sentences on direct appeal.

Kellam moved for postconviction relief under Superior Court Criminal Rule 61, raising a host of reasons why he believes that he was unjustly convicted. The Superior Court rejected all but one of Kellam's grounds for relief. The court agreed with Kellam that, because the felony-murder jury instruction employed at his trial misstated the law, his felony-murder convictions and the corresponding life sentences could not stand.

In this appeal, Kellam challenges the Superior Court's rejection of two of the seven grounds for post-conviction relief alleged in his Rule 61 motion. He argues that the State's amendment of the indictment the grand jury returned at the outset of his case—an amendment to which he did not object—was so substantive that it resulted in his being convicted of an infamous crime—racketeering—for which he was not indicted. This, according to Kellam, so undermined the Superior Court's jurisdiction that the court should have vacated *all* his convictions. Kellam also contends that his trial counsel was ineffective for failing to request a jury instruction

2

touching upon how the jury should consider the prosecution's accomplice-liability theory.

We have concluded, for the reasons set forth below, that neither of Kellam's arguments has merit. In short, his challenge to the manner in which the indictment was amended is procedurally barred. And his effort to skirt the procedural bar by invoking a jurisdictional challenge is unavailing. Likewise, Kellam has not demonstrated that his trial counsel's strategic decision to refrain from requesting Kellam's preferred accomplice-liability instruction was objectively unreasonable. We therefore affirm the Superior Court's judgment as to these claims.

But that does not end our inquiry. The State has cross-appealed, arguing that the Superior Court erred when it vacated Kellam's felony-murder convictions because of the flawed felony-murder jury instruction. We agree with the State. Although the instruction was based on an outdated version of our felony-murder statute and should have drawn an objection from Kellam's trial counsel, Kellam cannot show that, but for the erroneous instruction, it is reasonably probable that the jury would have reached a different verdict on the felony-murder counts. The Superior Court concluded otherwise in reliance upon our decision in *Ray v. State*,[1] but as we explain below, *Ray* is distinguishable and does not control the outcome

---

[1] 280 A.3d 627 (Del. 2022).

3

here. We therefore reverse the Superior Court's vacatur of Kellam's felony-murder convictions.

I

A

On Friday, January 10, 2014, four men—Shamir Stratton and his cousins Damon Bethea,[2] Richard Robinson, and Rhamir Whaples—drove to Sussex County together from their homes in Pennsylvania and New Jersey. The men were ostensibly headed to Delaware for a Friday-night party at the Millsboro VFW at the invitation of another of Stratton's cousins—Kellam.[3] But the ulterior purpose of the trip to Sussex County was more sinister; while the men were in Delaware they also intended to "pull a lick," or in other words, commit a robbery, with Kellam.[4]

When the group arrived in Delaware and met with Kellam on Friday night, they had no target in mind. By Sunday evening, however, their sights had homed in on William Hopkins and Cletis Nelson—drug dealers operating out of a mobile home in Millsboro. Kellam and his group had run into Hopkins on Sunday afternoon near Kellam's home, where Stratton and his cousins were staying for the weekend.

---

[2] Our description of Bethea's actions in this opinion is based solely upon the evidentiary record in this case. We note that Bethea pleaded not guilty to charges arising from the events described in this opinion and was acquitted following a jury trial.

[3] Stratton was the common familial link between the men. Though not all of the men were related to each other, all were Stratton's cousins from various branches of his family. App. to Opening Br. at A817.

[4] *Id.* at A891.

4

Kellam's roommate, John Snead, for reasons unclear from the record, had found himself in a fight with Hopkins. The group resolved to let Hopkins and Snead fight one-on-one, but Snead was so intoxicated that Hopkins, without much effort, was able to "rough him up."[5]

Later that evening, one of Kellam's friends, Carlton Gibbs, invited Kellam, as well as Stratton, Robinson, Bethea, and Waples, to hang out with him at the Sea Esta Motel in Long Neck. There, Kellam met Rachel Rentoul and Jackie Heverin, sex workers that Gibbs had hired for the evening. Rentoul also happened to be Nelson's girlfriend. She had been at Hopkins and Nelson's trailer earlier in the day but had left after she saw text messages from another woman on Nelson's cellphone.[6] At some point during the evening before Kellam and his group arrived at the motel, Rentoul had briefly returned to Hopkins and Nelson's home to buy heroin. While she was there, she saw Nelson counting thousands of dollars in cash. At the motel, she explained to Kellam and the other men how she knew Hopkins and Nelson and told the group that she had seen Nelson counting cash inside their home.

With this information from Rentoul, Kellam's plan for a robbery fell into place. Rentoul and Heverin would show the men where Hopkins and Nelson lived, and Stratton, Bethea, Robinson and Waples would carry out the robbery. Driving in

---

[5] *Id.* at A869.

[6] Coincidentally, Rentoul had run into Stratton outside a liquor store the previous day and exchanged cellphone numbers with him.

two cars, the group stopped on their way to Hopkins' home to pick up three handguns. Kellam gave the weapons to Bethea, Robinson, and Waples. Once Stratton, Bethea, Robinson, and Waples were in position outside Hopkins and Nelson's home, they asked Kellam over the phone what they should do with any people they found inside. Kellam responded, "kill 'em."[7]

The robbery itself was swift and brutal. While Stratton waited outside, Bethea climbed into the trailer through an open window so that he could quietly open the back door for Robinson and Waples. When Robinson walked into the trailer, he saw Bethea holding Hopkins by his hair. The men asked Hopkins where he was keeping the money, and Hopkins pointed to his jacket. After the men had emptied the jacket, they began to "destroy[] the place" in search of more cash.[8] In the course of ransacking the trailer, Waples and Robinson "hit [Hopkins] with the guns a few times[,]" believing that Hopkins would reveal the location of any additional money; he did not.[9] Robinson then "just started shooting[,]"[10] and Waples joined in. When asked at trial why he shot Hopkins, Robinson said, "I was just listening to [Kellam]."[11]

---

[7] App. to Opening Br. at A907.
[8] *Id.* at A1189–90.
[9] *Id.* at A1191.
[10] *Id.* at A1192.
[11] *Id.* at A1194.

6

It was not until Hopkins had been fatally shot that the men realized that Nelson was also in the trailer. They ordered him into the room with them and forced him to lie on his stomach. When Nelson tried to look up, Waples shot him in the side of the head. Bethea then shot Nelson in the neck and the men once more started shooting indiscriminately. An autopsy of each body revealed that Hopkins had been shot a total of ten times and Nelson a total of eight times.[12]

After the robbery, Kellam collected the proceeds and split them between the group, reserving $500 for Rentoul and Heverin. Stratton, Bethea, Robinson and Waples left to drive home. Kellam went back to the Sea Esta Motel to give Rentoul her share of the money.

B

In December 2014, Robinson, Waples, and their cousin, Tyreek "B-Hop" Waples, returned to Delaware at Kellam's invitation. The men had come to Delaware to "do another robbery."[13] This time, the target was Milton "Fat Dice" Lofland. The men did not know who Lofland was before driving down to Delaware, but Robinson testified at trial that he had heard from Kellam that Lofland was a drug dealer with enough money to be a worthwhile target.

---

[12] App. to Answering Br. at B62–63, B65.
[13] App. to Opening Br. at A1223.

Kellam provided the men with guns—"a Glock and a .38 special"[14]—and sent them to Lofland's house with a fourth man identified in the record only as "John Snead's friend."[15] Snead's friend kicked down the back door of Lofland's house and inside, in a bedroom, the men found Lofland and his girlfriend, Connie Steward. The men "pistol whipped" Lofland, hitting him with their guns while demanding that he show them where he kept his money.[16] Lofland told the men that he did not keep any money in the house. Robinson punched Steward in the face because she was "[s]creaming[,]" and he wanted her to "shut up."[17] The men proceeded to "tear[] the house up"[18] in search of money and other valuables. In particularly callous fashion, the men started "tearing up [Steward's] Christmas presents"[19] with the hope of finding items worth stealing. The men left Lofland's house with a watch, a DVD player, and a pair of sneakers.

C

While Robinson, Waples, and B-Hop were in Sussex County that December, Kellam also told them about Azel Foster. Like Lofland, Foster was a drug dealer whom Kellam believed would make a good target for another robbery. Three days after the Lofland home invasion, as he had done before, Kellam provided the men

---

[14] *Id.* at A1235.
[15] *Id.*
[16] *Id.* at A1239.
[17] *Id.* at A1239–40.
[18] App. to Answering Br. at B139.
[19] *Id.*

with weapons, told them where Foster lived, and sent them to rob him. But unlike the victims of the past home invasions, Foster, who lived with his fiancée and two young children, was armed. When the intruders kicked in Foster's front door and made their way to his bedroom, Foster began to shoot at them. Robinson only had five bullets in his weapon, and the other gun provided by Kellam did not work. Once Robinson ran out of ammo, the group fled without taking anything from the home. In the brief crossfire, Foster was struck in the shoulder by one of Robinson's shots.

D

In March 2015, police obtained a wiretap order permitting them to monitor activity connected to two cellphone numbers associated with Kellam. At this stage, the details of the evidence flowing from the wiretaps that enabled the State to arrest and charge Kellam are not relevant. It suffices to say that police monitoring Kellam's cellphone activity intercepted numerous communications between Kellam and other participants in both the Hopkins and Nelson murders and December 2014 home invasions that connected them to the crimes. In one particularly damning text message, Kellam wrote, "I know where to send the goons the next time they come through [to Delaware]."[20] A witness at trial testified that "the goons" were Robinson and Waples.[21]

---

[20] *Id.* at B43–44.
[21] *Id.* at B190.

Kellam was arrested in June 2015. A grand jury returned an 81-count indictment against him[22] that included one count of racketeering, two counts of first-degree felony murder, five counts of home invasion, one count of attempted murder, multiple counts of conspiracy, multiple counts of assault, and dozens of firearm offenses stemming from each home invasion.

E

Two of the five counts of home invasion in the original indictment stemmed from two other home invasions and robberies that allegedly took place in May and August 2014. The original indictment alleged that, in addition to the home invasions described in detail above, Kellam had orchestrated two other break-ins that targeted two other individuals—Leonard Moore and Isaiah Phillips. Kellam's racketeering charge also included these home invasions as predicate offenses constituting the "pattern of racketeering activity" necessary to sustain a conviction for racketeering.[23]

Before trial, the State amended Kellam's indictment under Superior Court Rule 7(e)[24] to remove any mention of the Moore and Phillips home invasions.[25] The

---

[22] The indictment also named Waples, Robinson, Bethea, Stratton, Gibbs, Rentoul, and Heverin.
[23] App. to Opening Br. at A38–39.
[24] Superior Court Criminal Rule 7(e) provides that "[t]he court may permit an indictment or an information to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."
[25] This included removing any firearm offenses and other charges related to the Moore and Phillips home invasions. App. to Opening Br. at A73–99.

State amended the indictment twice more during trial.[26]  The operative indictment as it read when the case was submitted to the jury comprised 47 counts.  Count I, Kellam's racketeering charge, alleged a "pattern of racketeering activity" consisting only of the Nelson and Hopkins home invasion and murders, the Lofland home invasion, and the Foster home invasion.[27]

## F

Trial was held in September 2017.  The State's theory of the case was that Kellam "planned these home invasions; [and] . . . aided [in] the[ir] commission by providing guns, pointing out the location, driving and, essentially, giving the orders to go in and commit the robberies; and in the case of William Hopkins and Cletis Nelson, that he gave the order to kill."[28]  Kellam, in the State's telling, was like a "general"[29] who "ran this organization.  He participated in this organization.  And he assembled his workers or his soldiers with young family members from out of town . . . ."[30]

The defense, for its part, aimed to sow reasonable doubt by emphasizing that nearly all the State's key witnesses, including Stratton, Robinson, Waples, Rentoul,

---

[26] The at-trial amendments removed one count of conspiracy to commit racketeering, one count of reckless endangering, changed Kellam's attempted murder charge to an assault charge, and removed a number of PFDCF charges.  *See id.* at A100, A133.

[27] *Id.* at A156.

[28] *Id.* at A584–85.

[29] *Id.* at A1502

[30] *Id.*

and Heverin, had been offered, and had accepted, plea agreements in exchange for their testimony against Kellam. And this testimony, according to defense counsel, was so "inconsistent, contradictory, and at times outright untruthful" as to preclude a finding beyond a reasonable doubt that Kellam was the "general" behind each crime.[31]

The State informed the jury that, for most of Kellam's charges, its goal was to establish Kellam's guilt under a theory of accomplice liability. The State made this point clearly in its closing argument:

> The State hasn't alleged that that the defendant went into any of the homes that we have been talking about from the testimony in this trial. For the charges I stated, the 43 charges, notwithstanding the conspiracies and the racketeering, he has been charged under the accomplice/liability [sic] theory.
>
> . . .
>
> A person is guilty of an offense committed by another person when, intending to promote or facilitate the commission of the offense, the person aids, counsels, or agrees to aid the other person in planning or committing it.
> That is the general. That's what the general does. A general doesn't grab a rifle and hit the battlefield. A general aids and counsels his soldiers on how to execute the plan, how to execute the home invasion, provide supplies to execute the home invasion, like guns.[32]

---

[31] Trial Tr. at 56 (Sept. 21, 2017).
[32] App. to Opening Br. at A1516–17.

G

Two parts of the instructions ultimately provided to the jury warrant discussion. First, in light of the State's theory of the case—that is, its portrayal of Kellam as a "general" who did not directly participate in each home invasion—the instructions included an accomplice-liability instruction. Tracking 11 *Del. C.* § 271, the instruction informed the jury that, to convict Kellam for the crimes of his accomplices, it was required to make certain findings beyond a reasonable doubt:

> So, in order to find a person guilty of an offense physically committed by another person, you must find all three of the following elements beyond a reasonable doubt:
>
> (1) The other person committed the elements of the offenses charge[d]; or, the other person and the defendant, together, committed the elements of the offenses charged, and
> (2) The defendant intended to promote or facilitate the commission of the offenses and conduct, which resulted in the robberies, attempted robberies, and home invasions, and
> (3) The defendant aided, counseled, or agreed to aid the other person in planning or committing the offenses leading up to and resulting in the aforementioned offenses, and that the murders and assaults were reasonably foreseeable crimes.[33]

The accomplice-liability instruction also specified that it was "applicable to the State's allegation as to the home invasions, robbery offenses, two murder offenses, assault offenses, and attempted robbery offenses, as well as the allegation of the companion offenses of possession of the firearm."[34]

---

[33] *Id.* at A390–91.
[34] *Id.* at A393.

Ordinarily, where the underlying offenses are divisible into degrees, as was the case here,[35] a jury instruction concerning accomplice liability under Section 271 is accompanied by an instruction describing 11 *Del. C.* § 274. According to that section, individuals prosecuted under a theory of accomplice liability are guilty only of the degree of the underlying offense that matches their culpable mental state. Specifically:

> When, pursuant to § 271 of this title, 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance.[36]

Kellam's trial counsel did not request that an instruction under Section 274 accompany the Section 271 accomplice-liability instruction. On this point, in a postconviction declaration, trial counsel averred that he made a strategic decision not to do so because such an instruction was not factually supported and he did not view convictions on lesser-included offenses as "a win" for Kellam. Those

---

[35] Kellam's first-degree murder and second-degree assault charges required the jury to find beyond a reasonable doubt that Kellam acted intentionally or recklessly. *See* App. to Opening Br. at A398 (first-degree murder jury instruction); *Id.* at A407 (second-degree assault instruction). Both charges had lesser-included offenses that would require the jury to find a culpable mental state of criminal negligence. *See* 11 *Del. C.* § 635(2) ("A person is guilty of murder in the second degree when: . . . While engaged in the commission of, or attempt to commit, or flight after committing a felony, the person, with criminal negligence, causes the death of another person."); 11 *Del. C.* § 611 ("A person is guilty of assault in the third degree when: . . . With criminal negligence the person causes physical injury to another person by means of a deadly weapon or a dangerous instrument.").

[36] 11 *Del. C.* § 274.

14

convictions, he explained, would also have resulted in Kellam's incarceration for life, and he feared that requesting such an instruction would undermine his credibility with the jury.[37]

The second notable aspect of the jury instructions is the instruction on Kellam's first-degree felony-murder charges. The instruction first provided a correct statement of the first-degree felony-murder statute, 11 *Del. C.* 636(a)(2), in its entirety. The instruction correctly explained that "[a] person is guilty of murder in the first degree when: While engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any felony, the person recklessly causes the death of another person."[38] It then broke the crime down into its elements for the jury:

> In order to find Defendant guilty of Murder in the First Degree, you must find that the State proved the following three (3) elements beyond a reasonable doubt:
>
> (1) Defendant caused a person's death;
>
> (2) The person's death occurred *in the course of and in furtherance of* Defendant's commission of a felony, attempt to commit a felony, or Defendant's immediate flight after committing a felony. The alleged felony is home invasion and robbery of Cletis Nelson as to Count 2. The alleged felony is home invasion and robbery of William Hopkins as to Count 6.
>
> . . .

---

[37] App. to Answering Br. at B420–422.
[38] App. to Opening Br. at A398; 11 *Del. C.* § 636(a)(2).

> > (3) Defendant acted recklessly.
>
> > . . .
>
> > The State alleged the Defendant is guilty as an accomplice for the acts of his co-defendants.[39]

But the phrase "in the course of and in furtherance of" included in this part of the jury instruction was no longer part of our first-degree felony-murder statute when Kellam stood trial. Indeed, in 2004, in response to a decision of this Court,[40] the General Assembly amended the statute to remove the requirement that a killing be "in furtherance of" the underlying felony to constitute first-degree felony murder. The new first-degree felony-murder statute, as correctly stated at the outset of the felony-murder instruction, requires that a killing occur "while engaged in" the underlying felony.

The inclusion of the outdated language went unnoticed at trial and was not raised on direct appeal. In an affidavit provided by Kellam's trial counsel during Rule 61 proceedings, trial counsel wrote: "Mr. Kellam points out that in one section of the jury instructions, the outdated 'in furtherance of' language was inadvertently included. He is correct about that. I did not notice it. No excuse."[41]

---

[39] App. to Opening Br. at A398–99 (emphasis added).

[40] *See Williams v. State*, 818 A.2d 906, 911–12 (Del. 2003) (holding that for a killing to be "in furtherance of" a felony, the killing must "occur during the felony and that the murder occur to help move the felony forward").

[41] App. to Answering Br. at B420.

16

## H

Kellam was convicted on all counts in the amended indictment except for three counts of possession of a firearm during the commission of a felony where the gun was possessed by an unknown individual—"Snead's friend"—during the Lofland home invasion. As noted above, Kellam was sentenced to two life sentences, plus 770 years of Level V incarceration, suspended after 769 years. On direct appeal, this Court affirmed Kellam's convictions.[42]

Kellam filed a timely pro se motion for postconviction relief in August 2019 and after the Superior Court appointed counsel to represent Kellam, he filed two amended motions for postconviction relief. The operative amended motion alleged that the Superior Court was divested of its jurisdiction to try Kellam's case following the amendments to his racketeering charge. Kellam alleged further that his trial counsel was ineffective because of (i) his failure to move to sever the charges following the amendment to the indictment, (ii) his failure to move for the recusal of the trial judge, (iii) his failure to request a jury instruction under Section 274, (iv) his failure to object to the faulty felony-murder instruction, and (v) his failure to introduce cellular data evidence that was beneficial to Kellam's defense. Kellam also alleged that the cumulative effect of these errors warranted vacatur of his convictions.

---

[42] *Kellam v. State*, 212 A.3d 804, 2019 WL 2484748 (Del. June 13, 2019) (TABLE).

Following oral argument, the Superior Court denied all Kellam's claims for postconviction relief except one. The Superior Court found that Kellam's trial counsel was ineffective for failing to object to the jury instruction containing an outdated statement of the elements needed to convict him of first-degree felony murder under 11 *Del. C.* § 636(a)(2). As a result, the Superior Court vacated Kellam's murder convictions and related firearm charges. This appeal and cross-appeal followed.

Kellam raises two issues in his appeal from the Superior Court's Rule 61 opinion. He first contends that the Superior Court erred when it found that the amendment to Kellam's indictment removing two of the five predicate offenses forming his racketeering charge was proper and did not deprive the trial court of jurisdiction over Kellam's case.[43] He then contends that the Superior Court erred when it denied his ineffective-assistance-of-counsel claim arising from his counsel's failure to request a jury instruction under 11 *Del. C.* § 274 that deprived the jury of the ability to convict Kellam of lesser-included offenses of the charges on which he was ultimately convicted.[44]

The State contends in its cross-appeal that the Superior Court erred by finding that Kellam had successfully shown ineffective assistance of counsel resulting from

---

[43] Opening Br. at 21.
[44] *Id.* at 38.

18

his trial counsel's failure to object to the felony-murder jury instruction based on the pre-2004 version of the first-degree felony-murder statute.[45]

## II

Before we turn to the merits of the parties' respective claims, we would do well to identify the standard and scope of our review. Likewise, a summary of the procedural considerations governing motions for postconviction relief under Superior Court Criminal Rule 61 and the settled standard for the analysis of ineffective-assistance-of-counsel claims will, we hope, provide a helpful background for our analysis.

## A

"In general, we review the Superior Court's denial of a motion for postconviction relief for abuse of discretion."[46] When a motion for postconviction relief implicates "legal or constitutional questions, including ineffective-assistance-of-counsel claims," our review is *de novo*.[47]

## B

Under Superior Court Rule 61, before we may address the merits of a claim for postconviction relief, we must first determine whether that claim is procedurally

---

[45] State's Answering Br. and Opening Br. on Cross-Appeal at 47.
[46] *Cooke v. State*, -- A.3d --, 2025 WL 16395, at *22 (Del. Jan. 2, 2025) (citing *Powell v. State*, 173 A.3d 1044, 1046 (Del. 2017)).
[47] *Green v. State*, 238 A.3d 160, 173 (Del. 2020).

barred by Rule 61(i).[48]  Relevant here are subsections (3) and (5) of Rule 61(i), which read as follows:

> (3) *Procedural default*.  Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows
> (A) Cause for relief from the procedural default and
> (B) Prejudice from violation of the movant's rights.
>
> . . .
>
> (5) *Bars inapplicable*.  The bars to relief in paragraphs (1), (2), (3), and (4) of this subdivision shall not apply . . . to a claim that the court lacked jurisdiction . . . .[49]

Absent extraordinary circumstances, an ineffective-assistance-of-counsel claim cannot be asserted in the proceedings leading to a judgment of conviction.[50] Consequently, Rule 61(i)(3) generally does not apply to such claims.[51]  We will address any relevant procedural bars as they relate to each of Kellam's claims before—where necessary—turning to the merits of each claim.

C

To succeed on a claim of ineffective assistance of counsel, a movant must satisfy the two-part standard set forth in *Strickland v. Washington*.[52]  Kellam must

---

[48] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).
[49] Super Ct. Crim. R. 61(i)(3), (i)(5).
[50] *Cooke*, 2025 WL 16395, at *23.
[51] *Id.*
[52] 466 U.S. 668 (1984).

first show that his trial counsel's "representation fell below an objective standard of reasonableness."[53] If Kellam succeeds in showing that his counsel's representation was objectively unreasonable, he must then show that his trial counsel's deficient performance was prejudicial to his defense.[54]

"To prevail on the first part of the *Strickland* test—the performance prong— [Kellam] bears a heavy burden."[55] We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" and Kellam bears the burden of persuasion to rebut this strong presumption.[56] Kellam must do more than "merely . . . show[] that his counsel could have conducted his defense more effectively."[57] Instead, he must show that "no competent attorney would have chosen the challenged course of action."[58] And when "an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options," the presumption that counsel's conduct was objectively reasonable is "virtually unchallengeable."[59] Our analysis of attorney performance is "highly deferential" to trial counsel's decisions because it is "all too easy for a court,

---

[53] *Id.* at 688.
[54] *Id.*
[55] *Kent v. State*, -- A.3d --, 2025 WL 952065, at *8 (Del. Mar. 31, 2025) (citing *Cooke*, 2025 WL 16395, at *24).
[56] *Cooke*, 2025 WL 16395, at *24 (quoting *Green*, 238 A.3d at 178).
[57] *Id.*
[58] *Green*, 238 A.3d at 173 (citing *Premo v. Moore*, 562 U.S. 115, 124 (2011)).
[59] *Cooke*, 2025 WL 16395, at *24 (quoting *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014)) (internal quotation marks omitted).

examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."[60]  To that end, in evaluating an ineffective-assistance-of-counsel claim, we must make "every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[61]

But "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[62]  That is to say, even if Kellam is successful on *Strickland*'s performance prong, he must also show that he suffered prejudice as a result of his trial counsel's deficient performance.[63] Kellam must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[64]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome.  That requires a substantial, not just conceivable, likelihood of a different result."[65]  We may dispose of an ineffective-

---

[60] *Strickland*, 466 U.S. at 689.
[61] *Id.*
[62] *Id.* at 691.
[63] *Id.* at 687.
[64] *Id.* at 694.
[65] *Cooke*, 2025 WL 16395, at \*25 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)) (internal quotation marks omitted).  *See also Starling v. State*, 130 A.3d 316, 325 (Del. 2015).

assistance-of-counsel claim based on the absence of prejudice alone if, in fact, prejudice is lacking.[66]

III

A

Kellam first argues that all his convictions must be vacated because the racketeering charge as presented in the amended indictment was defective in a manner that deprived the Superior Court of jurisdiction to try his case. Kellam was charged with racketeering under 11 *Del. C.* § 1503(a). Under that statute, a person is guilty of racketeering when they are "associated with" an enterprise and participate "in the conduct of the affairs of the enterprise through a pattern of racketeering activity."[67] "Racketeering activity" is defined broadly and includes the commission of robberies.[68] A "pattern of racketeering activity" is defined as:

> 2 or more incidents of conduct:
> a. That:
>> 1. Constitute racketeering activity;
>> 2. Are related to the affairs of the enterprise;
>> 3. Are not so closely related to each other and connected in point of time and place that they constitute a single event; and
> b. Where:
>> 1. At least 1 of the incidents of conduct occurred after July 9, 1986;
>> 2. The last incident of conduct occurred within 10 years after a prior occasion of conduct; and
>> 3. As to criminal charges, but not as to civil proceedings, at least 1 of the incidents of conduct constituted a felony under the Delaware

---

[66] *Green*, 238 A.3d at 174–75.
[67] 11 *Del. C.* § 1503(a).
[68] *Id.* § 1502(9); 18 U.S.C. § 1961(1)(A)–(D).

23

Criminal Code, or if committed subject to the jurisdiction of the United States or any state of the United States, would constitute a felony under the Delaware Criminal Code if committed in the State.[69]

Kellam contends that when the State amended his indictment under Superior Court Criminal Rule 7(e) to remove any reference to the Moore and Phillips home invasions—two of the five underlying events constituting a "pattern of racketeering activity" enumerated in the original indictment—the change was so substantial as to result in Kellam being tried "on [a] felony charge that w[as] not indicted."[70] The Superior Court did not address Rule 61(i)(3)'s bar of procedurally defaulted grounds for relief before finding against Kellam on the merits of his claim. We undertake that preliminary analysis here.

1

The gravamen of Kellam's claim is that the amendment that eliminated the Moore and Phillips home invasions from the original indictment was improper.[71] He speculates that the grand jury might have relied on these events when it returned the original indictment. He concedes, however, that in the trial court he did not object to the amendment of the indictment. A challenge to an indictment, unlike a claim of ineffective assistance of counsel, may be raised in proceedings leading to the judgment of conviction. This means that Kellam's claim is procedurally barred by

---

[69] 11 *Del. C.* § 1502(5).
[70] Opening Br. at 24.
[71] *Id.* at 22–23.

Rule 61(i)(3) absent a showing of cause and prejudice under Rule 61(i)(3)(A) and (B) or a showing that Rule 61(i)(3) is inapplicable under Rule 61(i)(5).

Kellam makes no attempt to argue either cause or prejudice.[72] Instead, he contends that his claim is not procedurally barred because the defect in his indictment divests the Superior Court of jurisdiction. Because Rule 61(i)(5) renders Rule 61(i)(3)'s bar inapplicable to "a claim that the court lacked jurisdiction[,]"[73] Kellam argues that his claim should be heard on its merits.

This argument overlooks precedent from this Court. In *Fountain v. State*,[74] we affirmed the denial of a motion for postconviction relief where the movant, like Kellam, had challenged a defective indictment on the grounds that it divested the Superior Court of jurisdiction. In that case, the defendant was convicted under a statute making it unlawful "to carry concealed a deadly weapon upon or about his person with the intent to use such weapon in violation of law" but argued that his indictment was defective and divested the Superior Court of jurisdiction because it omitted an essential element of the crime charged.[75] Specifically, Fountain's indictment did not allege that he carried the weapon "with intent to use it in violation of law."[76]

---

[72] *See* Reply Br. and Answering Br. on Cross-Appeal at 3–6.
[73] Super Ct. Crim. R. 61(i)(5).
[74] 288 A.2d 277 (Del. 1972).
[75] *Id.* at 278.
[76] *Id.*

25

Fountain challenged his conviction under Rule 61's predecessor—former Superior Court Rule 35. That rule permitted motions for postconviction relief at any time upon a claim that "the court imposing the sentence was without jurisdiction to do so."[77] Even though this Court agreed that Fountain's indictment was defective, we held that "the inadequate information was not a jurisdictional defect within the meaning of Rule 35" and denied Fountain's motion for postconviction relief.[78] This was because, as the *Fountain* court explained,

> [w]here the law gives the power to entertain a cause, and the pleadings state facts sufficient to show that such a cause is intended or attempted to be brought before the court, the court has jurisdiction to entertain or proceed with it even though the pleading does not state facts sufficient to constitute a cause of action or a crime, as the case may be.[79]

As Kellam correctly points out, "*Fountain* is not to be read as eliminating [all] jurisdictional challenges based on a defective indictment."[80] But the circumstances under which a defective indictment—one harboring a so-called "non-curable" defect—would divest the Superior Court of jurisdiction are extraordinary.[81] Where "the defect is curable through an amended information, the inadequate information

---

[77] *Id.* at 278 (star footnote).
[78] *Id.* at 278–79.
[79] *Fountain*, 288 A.2d at 279 (quoting *Barlow v. Davis*, 137 P.2d 357, 360 (Utah 1943)) (internal quotation marks omitted).
[80] Reply Br. and Answering Br. on Cross-Appeal at 6.
[81] A non-curable defect in an indictment, we have explained, would exist where the "Superior Court lacked jurisdiction over the defendant's conduct." *Downer v. State*, 543 A.2d 309, 310 (Del. 1988).

26

[does] not deprive the [c]ourt of jurisdiction over the offense."[82]  In recent years, we have applied *Fountain*'s rule—that a curable defect in an indictment is not jurisdictional defect—in claims for postconviction relief brought under Rule 61.[83]

Kellam fails to explain why any alleged defect in his indictment was non-curable.  Nor does he attempt to argue that the original indictment returned by the grand jury—including the Moore and Phillips home invasions—was defective such that the Superior Court lacked jurisdiction.  Kellam's sole argument is that the "indictment was substantively amended to change the crimes with which he was charged and not re-presented to the Grand Jury" making the defect "an incurable jurisdiction challenge."[84]  Kellam is unable, however, to show why the alleged defect in his indictment—given that it arose from an amendment to his indictment by the State under Superior Court Criminal Rule 7(e)—was not also curable by amendment. Because the alleged defect in Kellam's indictment was curable, he has not asserted a claim that the Superior Court lacked jurisdiction to try him, and the jurisdiction exception to Rule 61's procedural bars contained in Rule 61(i)(5) is inapplicable.

---

[82] *Id.*

[83] *See Samuel v. State*, 283 A.3d 1182, 2022 WL 3581797 (Del. Aug. 19, 2022) (TABLE) (holding that an indictment's failure to correctly identify the location where two charges of assault took place was not a jurisdictional defect under Rule 61(i)(5)). *See also Miller v. State*, 225 A.3d 721, 2020 WL 582715 (Del. Feb. 5, 2020) (TABLE); *Ortiz v. State*, 225 A.3d 1267, 2020 WL 873593 (Del. Feb. 21, 2020) (TABLE).

[84] Reply Br. and Answering Br. on Cross-Appeal at 6.

Accordingly, because he did not raise this issue in the proceedings leading to his conviction and has not argued cause and prejudice excusing his default, Kellam's claim is procedurally barred under Rule 61(i)(3).

B

Next, Kellam contends that his trial counsel was ineffective for failing to request a jury instruction under 11 *Del. C.* § 274 that would have permitted the jury to find him guilty of lesser-included offenses of his charges of murder in the first degree, assault, home invasion, and robbery.[85] Kellam claims that his trial counsel's performance fell below an objective standard of reasonableness when he failed to request a Section 274 instruction. He further argues that, because of this allegedly deficient performance, there was a substantial likelihood of a different result at trial because the jury would likely have convicted him of those lesser-included offenses.[86] Because this claim alleges ineffective assistance of counsel, it is not procedurally barred by Rule 61(i)(3).[87]

The Superior Court found that Kellam's trial counsel made an objectively reasonable strategic decision when he chose not to request a Section 274 instruction. We agree.

---

[85] Opening Br. at 40.
[86] *Id.* at 44–45.
[87] *See* nn. 50–51, *supra.*

Kellam's claim falters on *Strickland*'s performance prong. We have counseled that our application of the *Strickland* standard be highly deferential to strategic decisions made by trial counsel.[88] The decision whether or not to request a specific jury instruction is a matter of trial strategy.[89] We have also held specifically that, where trial counsel makes a "conscious . . . [and] professionally reasonable decision to take an 'all-or-nothing' approach" to his client's defense by declining to request a Section 274 instruction, we will defer to that decision.[90] Additionally, where trial counsel makes this strategic decision after a thorough investigation of the law and facts of his case, the decision is "virtually unchallengeable."[91] This decision fits that bill. Kellam's trial counsel laid out in detail the considerations supporting his decision not to request a Section 274 instruction in two affidavits submitted during Kellam's postconviction proceedings. A review of these affidavits reveals that trial counsel's strategic decision not to request a Section 274 instruction was fully informed and objectively reasonable.

Kellam's trial counsel maintained that his decision not to request a Section 274 instruction was "intentional."[92] In his view, this was an "all-or-nothing" case.[93]

---

[88] *Cooke*, 2025 WL 16395, at *24.
[89] *State v. Dickinson*, 2012 WL 3573943, at *7 (Del. Super. Ct. Aug. 17, 2012).
[90] *Chrichlow v. State*, 49 A.3d 1192, 2012 WL 3089403, at *2 (Del. July 30, 2012) (TABLE).
[91] *Cooke*, 2025 WL 16395, at *24 (quoting *Purnell* 106 A.3d at 342).
[92] App. to Answering Br. at B420.
[93] *Id.*

He did not view convictions on any lesser-included offenses as a "win" for Kellam because they "would have put Mr. Kellam in prison for life anyway."[94] Counsel's goal therefore was to obtain not-guilty verdicts.

Kellam's trial counsel also believed, based on his knowledge of the facts of the case and applicable law, that "there was no factual basis" to request a Section 274 instruction.[95] The only charges Kellam faced with lesser-included offenses based on a subjective mental state element that would become relevant because of a Section 274 instruction were first-degree felony murder and second-degree assault. The lesser-included offenses to these charges both require a culpable mental state of criminal negligence. A person is guilty of second-degree felony murder when, "[w]hile engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any felony, the person, *with criminal negligence*, causes the death of another person."[96] And a person is guilty of third-degree assault when "*with criminal negligence* the person causes physical injury to another person by means of a deadly weapon or a dangerous instrument."[97]

Here, trial counsel was confronted with the brutality of the Hopkins and Nelson murders and the nature of the assaults committed during the Lofland and

---

[94] *Id.* at B421.
[95] *Id.*
[96] 11 *Del. C.* § 635(2) (emphasis added).
[97] 11 *Del. C.* § 611 (emphasis added).

30

Foster home invasions, and, in consequence, concluded that there was no factual basis to argue that Kellam had acted with criminal negligence.[98] He also considered the possibility that the jury could find Kellam guilty of lesser-included offenses based on a finding that Kellam lacked accountability for aggravating factors such as the use of firearms in each home invasion, robbery, and assault to be "too fanciful to contemplate."[99] Moreover, trial counsel believed that "[t]here was ample room for reasonable doubt in [Kellam's] case" given the unreliability of key witnesses for the State.[100] In trial counsel's view, "[e]ither the jury was going to believe Mr. Kellam was the mastermind controlling the others or they were not. Lesser-included offenses made no sense in this trial."[101] Nothing in the record leads us to believe that Kellam's trial counsel had anything but a complete understanding of the evidence presented at trial as well as an understanding of the effect of a jury instruction under 11 *Del. C.* § 274 were he to request one.

Thus, at its core, Kellam's argument asks us to second-guess a fully informed, strategic decision made by his trial counsel. We decline to do so. Kellam has failed to satisfy his burden under *Strickland*'s performance prong, and we affirm the Superior Court's denial of postconviction relief as to this claim.

---

[98] App. to Answering Br. at B421.
[99] *Id.* at B459.
[100] *Id.* at B460.
[101] *Id.* at B459.

31

Lastly, we turn to the State's cross-appeal. The State contends that the Superior Court erred when it determined that Kellam had shown ineffective assistance of counsel based on his trial counsel's failure to object to a first-degree felony-murder instruction that was indisputably incorrect. As mentioned, the instruction required the jury to find that the Hopkins and Nelson murders occurred "in the course of and in furtherance of" the underlying home invasion based on language that predated the 2004 amendment to the first-degree felony-murder statute.

The State takes issue with both the attorney performance and prejudice analysis conducted by the Superior Court. It urges us, despite a candid statement from Kellam's trial counsel that he "did not notice" the faulty jury instruction, to conclude this oversight by trial counsel was objectively reasonable.[102] As to prejudice, the State contends that, because the pre-2004 felony-murder statute requiring a jury to find that a killing occurred both "in the course of" and "in furtherance of"[103] the commission of a felony offense—unlike the current felony-murder statute requiring only that a killing occur "while engaged in"[104] the

---

[102] App. to Answering Br. at B420.
[103] 11 *Del. C.* 636(a)(2) (2003).
[104] 11 *Del. C.* 636(a)(2) (2024).

commission of or flight from a felony—the faulty instruction added an additional element necessary to convict Kellam and therefore was not prejudicial to his defense.

Kellam responds that, because his counsel wholly overlooked the faulty first-degree felony-murder instruction, there is no strategic decision to which we may defer, so we must agree with the Superior Court that trial counsel's performance was objectively unreasonable. Kellam's prejudice argument—and the Superior Court's opinion—leans heavily on our opinion in *Ray v. State*.[105] In that case, we granted postconviction relief to a movant challenging a near-identical defect in a first-degree felony-murder instruction. Kellam argues that *Ray* is controlling here and mandates that we affirm the Superior Court. He also argues that he has an "unqualified right to a correct statement of law" in the jury instructions that were presented at trial.[106]

As with the claim for ineffective assistance of counsel contained in Kellam's appeal, the procedural bar of Rule 61(i)(3) does not apply. We conclude that this case is distinguishable from *Ray* and that the Superior Court erred by granting Kellam postconviction relief on this claim.

1

We need not dwell on *Strickland*'s performance prong. To be sure, "trial counsel's performance is entitled to a strong presumption that is was reasonable."[107]

---

[105] 280 A.3d 627 (Del. 2022).
[106] Reply Br. and Answering Br. on Cross-Appeal at 36.
[107] *Ray*, 280 A.3d at 641.

33

And a lawyer's decision not to object to a faulty jury instruction, or a decision not to request a clarifying or limiting instruction, may be perfectly reasonable if such a decision is the product of "reasonable professional judgment and strategic considerations."[108] But here, as was the case in *Ray*, that did not happen.

Kellam's trial counsel candidly acknowledged that he "did not notice" the fact that jury instructions contained the outdated "in the course of and in furtherance of" language.[109] Also like *Ray*, it appears from the record that neither the trial judge nor the lawyers on either side noticed this error. Nor did anyone compare Kellam's amended indictment or the statement of the first-degree felony-murder statute in the jury instructions themselves, both of which contained a correct statement of the first-degree felony-murder statute, to the incorrect statement of the elements of first-degree felony murder provided in the jury instructions.

The record shows that defense counsel did not apply his professional judgment or otherwise consider whether to object to the first-degree felony-murder instruction. And to be clear, there is no doubt that the first-degree felony-murder instruction, as presented to the jury, contained an incorrect statement of law. It was

---

[108] *Id.* As discussed above, for example, though an accomplice-liability instruction under 11 *Del. C.* § 271 is ordinarily accompanied by an instruction under 11 *Del. C.* § 274, trial counsel may make a reasonable strategic decision not to request a Section 274 instruction. *See* Section III.B, *supra*.
[109] App. to Answering Br. at B420.

objectively unreasonable for trial counsel not to recognize this fact,[110] and this oversight precluded trial counsel from being able to exercise his professional judgment and make a strategic decision not to object—a decision that might well have been objectively reasonable and entitled to deference. Trial counsel did not bring his professional judgment to bear on this issue, and consequently, were Kellam able to show prejudice, he would certainly succeed on his ineffective-assistance-of-counsel claim. As we discuss next, however, the inclusion of the faulty jury instruction was not prejudicial to Kellam's defense.

2

"To demonstrate prejudice caused by counsel's ineffectiveness, a defendant must show that there is a reasonable probability, but for counsel's unprofessional errors, that the result of the proceeding would have been different."[111] When the probability is such that our confidence in the proceeding's outcome is undermined, we will find prejudice.[112]

The Superior Court's analysis of whether Kellam suffered prejudice because of his trial counsel's failure to object to the first-degree felony-murder instruction hewed closely to our decision in *Ray*. That case concerned a first-degree felony-

---

[110] *Ray*, 280 A.3d at 641–42 (holding that the existence of an incorrect jury instruction is "a fact that a reasonably competent attorney would recognize").

[111] *Green*, 238 A.3d at 174 (quoting *Starling*, 130 A.3d at 325).

[112] *Ray*, 280 A.3d at 642–43.

murder instruction with the same defect—inclusion of the "in the course of and in furtherance of" language from the pre-2004 statute—as the instruction given at Kellam's trial.[113] We vacated Ray's felony-murder conviction because the inclusion of the phrase "in furtherance of" and accompanying explanation that "'[i]n furtherance of means that [the victim's] death was caused by the defendant or his accomplice, who committed a felony' . . . improperly cleared a new path to a finding that Ray was guilty of first-degree murder."[114] "In particular, the instruction told the jury that Ray could be held responsible for first-degree felony murder even upon a finding that he had not caused [the victim's] death if it determined that his 'accomplice' had done so."[115]

The Superior Court, seizing on this language, found that the defective instruction in this case

> may have improperly cleared a new path for the jury to find that Mr. Kellam was guilty of first degree felony murder. The instruction told the jury that Mr. Kellam could be held responsible for first degree felony murder even upon a finding that he had not caused the victims' deaths if it determined that his accomplices had done so. This allowed the jury to hold Mr. Kellam responsible for the crimes of his accomplices.[116]

---

[113] *Id.* at 639.
[114] *Id.* at 644.
[115] *Id.*
[116] *Kellam*, 317 A.3d at 323.

36

In doing so, the Superior Court overlooked the fact that the State's theory in Kellam's case and the instructions given to the jury explicitly and correctly invited a finding that Kellam was liable for the conduct of his accomplices. That was not so in *Ray*.

Our decision in *Ray* did not rest solely on the basis that the jury instruction as provided in that case contained language from the pre-2004 felony-murder statute. We vacated Ray's convictions because the faulty jury instruction improperly introduced the notion of accomplice liability when no accomplice-liability instruction had been given; in fact, the trial judge in *Ray* had rejected the State's request for an accomplice-liability instruction for want of an evidentiary basis.[117]

This case is different. Unlike *Ray*, here, the State sought to convict Kellam of first-degree felony murder solely under a theory of accomplice liability. There was no attempt by the State to argue that Kellam personally murdered Nelson and Hopkins, and no evidence was presented indicating that Kellam had even stepped foot in the building where the murders occurred. Thus, an accomplice-liability instruction under 11 *Del. C.* § 271 was appropriate, and to be clear, necessary. The jury was given a correct accomplice-liability instruction, properly informing it that to find Kellam guilty of first-degree murder, it would need to do so based on the

---

[117] *Ray*, 280 A.3d at 644–45. In *Ray*, the State only presented evidence that Ray himself had fired the shots that killed his victim.

37

actions of Kellam's accomplices.  In particular, the jury was required to find that Kellam "intended to promote or facilitate the commission of the offenses and conduct" and that he "aided, counseled, or agreed to aid [his accomplices] in planning or committing the offenses leading up to and resulting in the aforementioned offenses, and that the murders . . . were reasonably foreseeable crimes."[118]  So, the faulty felony-murder jury instruction did not carve a "new path" to finding that Kellam was guilty of first-degree murder, and the concern animating our opinion in *Ray*—that the jury might have considered accomplice liability without being properly instructed to do so—is not present in this case.

Having found *Ray* distinguishable, we must still address whether the faulty first-degree felony-murder instruction given to the jury in Kellam's case together with a Section 271 instruction was prejudicial to his defense.[119]  We think not.  The temporal element of the felony-murder statute was not, as a practical matter, altered when the statute was amended in 2004.  Under the pre-amendment version, to constitute felony murder, the homicide must have occurred "in the course of" the underlying felony.  The amended version—the felony-murder statute under which Kellam was prosecuted—encompasses deaths caused "while" the defendant is engaging in underlying felonious conduct.  Both versions thus apply to deaths caused

---

[118] App. to Opening Br. at A391.
[119] Kellam does not claim that his trial counsel was ineffective for failing to appeal the defective jury instruction.

38

*during the time that* the defendant is committing or attempting to commit the underlying felony. Given that, we fail to see how the trial court's instruction in Kellam's case, which used both "while" and "in the course of" to describe the temporal element of felony murder, materially misstated that aspect to the crime of felony murder.[120] That the court's instruction added the defunct "in furtherance of" element—that is, required the State to prove an additional element—does not shake our confidence in the jury's determination that the State proved beyond a reasonable doubt each element of felony murder—including the temporal element—as it was defined when the crimes alleged in the indictment were committed.

We acknowledge that "a defendant is entitled to have a jury instructed with a correct statement of the substantive law."[121] But a defective jury instruction does not per se warrant reversal or vacatur of a conviction.[122] Our concern here is solely whether Kellam was prejudiced by the defective jury instruction within the meaning of *Strickland*'s second prong. And we conclude that he was not. We therefore reverse the Superior Court's partial grant of Kellam's motion for postconviction relief.

---

[120] App. to Opening Br. at A398. *See also Ray*, 280 A.3d at 644 ("'in the course of' could reasonably be understood as meaning 'while engaged in'").
[121] *Claudio v. State*, 958 A.2d 846, 851 (Del. 2008) (quoting *Guy v. State*, 913 A.2d 558, 563 (Del. 2006)).
[122] *See Floray v. State*, 720 A.2d 1132, 1138 (Del. 1998) (quoting *Probst v. State*, 547 A.2d 114, 119 (Del. 1988)) ("[S]ome inaccuracies are permissible in jury instructions, and a reversal is required only if the 'deficiency undermined the ability of the jury to intelligently perform its duty in returning a verdict.'").

39

# IV

For these reasons, as to Kellam's claims on appeal, we affirm the judgment of the Superior Court. We reverse the Superior Court's partial grant of Kellam's motion for postconviction relief and the vacatur of his felony-murder convictions and related firearm offenses and remand for the reinstatement of those convictions and corresponding sentences. Jurisdiction is not retained.

**VALIHURA, J.,** concurring:

I join the Majority opinion, except for one point: its treatment of Kellam's unqualified right to have the jury instructed with a correct statement of the substance of the law. I write separately to express my view that under circumstances such as those present here, such a clear and material violation of a defendant's "unqualified right" should have a remedy, or at least some consequence, even in the post-conviction context.

This Court has long held in the direct-appeal context that "[a]lthough a party is not entitled to a particular jury instruction, a party does have the *unqualified right* to have the jury instructed with a correct statement of the substance of the law."[1] In *Ray*, this Court recently restated and applied that principle in the post-conviction context: "we have long recognized that, although a defendant is not entitled to an instruction of his choosing, 'he does have the *unqualified right to a correct statement of the substance of the law*.'"[2] We then clarified that under *Strickland*'s ineffective assistance of counsel principles, "a lawyer's decision to refrain from objecting to a faulty jury instruction or requesting a clarifying one can be perfectly reasonable if it is the product of reasonable professional judgment and strategic considerations."[3] Essentially, we noted that this "unqualified right" is also a waivable one.

---

[1] *See, e.g.*, *Lloyd v. State*, 152 A.3d 1266, 1271 (Del. 2016) (quoting *Culver v. Bennett*, 588 A.2d 1094, 1096 (Del. 1991) (in turn citing *Flamer v. State*, 490 A.2d 104, 128 (Del. 1983))) (emphasis added); *Hastings v. State*, 289 A.3d 1264, 1270 (Del. 2023) (quoting *Bullock v. State*, 775 A.2d 1043, 1047 (Del. 2001)) ("It is settled that 'a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law.'").

[2] *Ray v. State*, 280 A.3d 627, 640 (Del. 2022) (quoting *Flamer*, 490 A.2d at 128) (emphasis added).

[3] *Id.* at 641.

We also held in *Ray* that trial counsel's failure to notice substantively incorrect felony-murder jury instructions was deficient performance because trial counsel "did not bring their professional judgment, reasonable or otherwise, to bear on this issue."[4] After noting the defendant's unqualified right to a correct instruction, and counsel's deficient performance (that did not constitute a waiver of that right), we conducted a prejudice analysis and concluded that Ray had been prejudiced by his counsel's deficient performance.[5]

Satisfying the *Strickland* test for ineffective assistance of counsel requires meeting both the "performance" prong and the "prejudice" prong.[6] The Majority holds that trial counsel's failure to notice the substantively incorrect felony-murder jury instructions in Kellam's trial satisfies the deficient performance prong of *Strickland* but not the prejudice prong. The Majority distinguishes *Ray* on the grounds that in *Ray*, the State proceeded against Kellam at trial under an accomplice theory of liability from the beginning, and § 271 accomplice liability instructions were given to the jury. Thus, unlike in *Ray*, the erroneous felony-murder jury instructions in this case did not open a potential new path to conviction based on the acts of Kellam's accomplices, and consequently, trial counsel's deficient performance here did not cause the type of prejudice that was present in *Ray*.

---

[4] *Id.*

[5] *Id.* at 642–46.

[6] *Id.* at 639 (quoting *Green v. State*, 238 A.3d 160, 174 (Del. 2020) (in turn citing *Strickland*, 466 U.S. at 687–88)).

42

But I am troubled by the disconnect between Kellam having, on one hand, an *"unqualified right"* to a *"correct statement of the substance of the law,"* and on the other hand, Kellam having no meaningful remedy, or as here, any real consequence at all, when that right is clearly violated in a material and substantive way. What then does it mean to have an *unqualified right* to a substantively correct jury instruction?

There is no dispute that Kellam's jury was instructed with a substantively incorrect statement of the law. The trial court first defined felony-murder for the jury using the correct, post-2004 version of the statute. The trial court then instructed the jury on the required elements using the pre-2004 version of the statute that included the "in furtherance of" language. It instructed that "in order to find the defendant guilty of murder in the first degree, you must find . . . the person's death occurred in the course of and in furtherance of the defendant's commission of a felony."[7] That part of the instruction tracks the pre-2004 version of Delaware's felony-murder statute, which imposed first degree murder liability when, "[i]n the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, the person recklessly causes the death of another person[.]"[8]

Thus, in instructing the jury, the trial judge actually referred to *both* the revised version of the statute and the pre-2004 version. Here is the pertinent part of those instructions:

---

[7]  App. to Opening Br. at A398.

[8]  11 *Del. C.* § 636(a)(2) (2001), *amended by* 74 Del. Laws. Ch. 246, § 2 (2004) (S.B. 238).

43

Delaware law defines the offense of Murder in the First Degree, in pertinent part, as follows:

A person is guilty of murder in the first degree when: While engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any felony, the person recklessly causes the death of another person.

In order to find the Defendant guilty of Murder in the First Degree, you must find the State proved the following three (3) elements beyond a reasonable doubt:

(1) Defendant caused a person's death;

(2) The person's death occurred in the course of and in furtherance of Defendant's commission of a felony, attempt to commit a felony, or Defendant's immediate flight after committing a felony. The alleged felony is home invasion and robbery of Cletis Nelson as to Count 2. The alleged felony is home invasion and robbery of William Hopkins as to Count 6. The jury must be unanimous of finding either (i) a home invasion or (ii) a robbery, or (iii) a home invasion and a robbery; and

(3) Defendant acted recklessly.[9]

It seems to me that referring to both the pre- and post-2004 versions in the same instruction is inherently confusing. Such a mix of conflicting instructions also gives the jury some discretion in choosing the law to apply. Faced with multiple options, we cannot know whether the jury applied the correct statute, the incorrect statute, or some blend of the two.

The legislative history indicates that the 2004 revision was a substantively material one. The General Assembly amended the felony-murder statute in 2004 to remove the "in furtherance of" language, changing the language of the statute to its current form, which reads instead: "A person is guilty of murder in the first degree when . . . [w]hile engaged in the commission of, or attempt to commit, or flight after committing or attempting to

---

[9]  App. to Opening Br. at A398.

commit any felony, the person recklessly causes the death of another person."[10]  The

synopsis of the bill amending the statute shows that this change was intended to be a

substantive change in response to this Court's decision in *Williams v. State*.[11]  The

amendment was also intended to bring Delaware's felony-murder statute in line with a

majority of other states.  The synopsis states:

> This Act eliminates the phrase "in the course of and in furtherance of" a
> felony that currently appears in Delaware's felony murder statutes.  This
> language is used in the felony murder statutes of only a few other states.  The
> Act will instead adopt language defining felony murder which is similar to
> the language used by thirty-eight other states, and which is already used in
> the felony murder provisions of Delaware's death penalty statute.
>
> The phrase "in furtherance of" as it appears in Delaware's existing felony
> murder law seems to require proof that a defendant specifically committed
> the homicide so as to complete his or her underlying felonious objective
> which is a showing more consistent with intentional murder as it is defined
> elsewhere in the criminal code.  *See, e.g.*, *Williams v. State*, 818 A.2d 906
> (Del. 2003).  Recently the Delaware Supreme Court has held that the wording
> of the felony murder statute means that there must be evidence that a killing
> was "intended to help the [underlying] felony progress." *Williams v. State*,
> 818 A.2d at 912.  Consequently, the wording of our existing felony murder
> statute requires an interpretation that is inconsistent with the common law
> rule, and with the definition of felony murder in almost every other state,
> which does not require evidence of specific intent in a felony murder
> prosecution.  Given the wording of the existing felony murder statute, certain
> particularly heinous murders that occur during the commission of another
> felony will not be prosecutable as felony murders.
>
> By adopting a definition of felony murder identical to the felony murder
> definition in Delaware's death penalty statute and similar to that used by a
> majority of other states, the application of the felony murder law will be more
> readily understood and consistent.[12]

---

[10]  11 *Del. C.* § 636(a)(2).

[11]  818 A.2d 906 (Del. 2002), *amended* Apr. 1, 2003.

[12] 74 Del. Laws. Ch. 246, synopsis (2004).

This legislative history illustrates the substantive nature of the change, *i.e.*, that it was intended to reduce the burden of proof and no longer require "that a defendant specifically committed the homicide so as to complete his or her underlying felonious objective."[13]

Thus, it is beyond dispute that Kellam's jury received a substantively incorrect jury instruction, which both the Superior Court and his trial counsel failed to notice, in violation of his "unqualified right" to a correct statement of the substance of the law.[14]   It was incorrect on not one, but two levels – it referred to the outdated statute, but it also combined the two versions confusingly in one instruction.

What then is his remedy?  The difficult part of this aspect of the State's cross-appeal is *Strickland*'s prejudice prong.  In the post-conviction *Strickland* context, absent some unusual circumstance,[15] or a structural error, such as a complete deprivation of counsel,[16]

---

[13]  *Id.*

[14]  *See, e.g.*, *Bullock*, 775 A.2d at 1053 (observing that, "[s]imply because the parties in a case agree on a particular set of instructions, does not excuse the trial judge's duty to give proper instructions."); *id*. at 1054 (holding that without a proper instruction, "the jury lacked the proper framework in which to analyze the facts in this case."); *see also Hall v. State*, 560 A.2d 490, 1989 WL 27783, at *1 (Del. Mar. 3, 1989) (TABLE) ("Regardless of requests from the parties, Superior Court has an obligation to charge the jury concerning the law in relation to the facts presented at trial.").

[15]  *See, e.g.*, *Bullock*, 775 A.2d at 1062 (Walsh, J., joined by Berger, J., dissenting) (recognizing that, "there may be unusual situations where the absence of a constitutionally-required portion of a jury instruction cannot be deemed waived by counsel's action or inaction," "[b]ut the remedy for such egregious error may be a claim of plain error in a direct appeal or a claim of ineffective assistance of counsel under Super. Ct. Crim. R. 61.").

[16]  *See, e.g.*, *Urquhart v. State*, 203 A.3d 719, 734 (Del. 2019) (holding that the complete absence of representation by trial counsel during the critical stage between arraignment and trial resulted in a denial of defendant's Sixth Amendment right to counsel).  In *Urquhart*, our Court found the prejudice prong of *Strickland* was "manifest from the record" because there was a "reasonable probability" that Urquhart would have accepted the plea if his counsel had provided professionally adequate consultation between client and counsel. *Id.* at 732–33.  Our Court found that Urquhart's counsel was ineffective under both *Strickland* and *United States v. Cronic*, 466 U.S. 648 (1984).

a demonstration of prejudice is generally required. Although we stated in *Ray* that defendants have such an *unqualified right*, we nevertheless engaged in a prejudice analysis. Thus, in the post-conviction context, the "unqualified right" to a substantively correct jury instruction apparently is qualified. Other decisions elsewhere suggest that it is not unusual for courts to require a defendant to demonstrate prejudice under *Strickland* where the claim for post-conviction relief involves an erroneous jury instruction.[17]

But as the Supreme Court observed in *Strickland*, the prejudice inquiry is not meant to be applied in a "mechanical" fashion.[18] The complexity of the felony-murder area of the law, combined with the gravity of the felony-murder charge, which carries the potential for a life sentence, tips the balance, in my view, towards a different approach than the approach taken by our Court here.[19] As noted above, the General Assembly, in enacting

---

*Id.* at 734. Under *Cronic*, a defendant is not required to demonstrate prejudice resulting from his counsel's deficient performance. Rather, it is presumed. *Cronic*, 466 U.S. at 658–59.

[17] *See, e.g., Baxter v. Superintendent Coal Twp. SCI*, 998 F.3d 542, 547–49 (3d Cir. 2021) (applying *Strickland*'s prejudice analysis where a federal habeas petitioner asserted that his trial counsel was ineffective for failing to object to the trial court's reasonable doubt jury instruction). The Third Circuit in *Baxter* stated that "[i]n *Weaver* [*v. Massachusetts*, 582 U.S. 286 (2017)], the Supreme Court acknowledged that its holding did not call into question precedents determining that certain structural errors, such as an erroneous jury instruction, require automatic reversal if raised on direct appeal." *Id.* at 548 n.6. It noted further that, "the Court [in *Weaver*] declined to address, in the context of structural errors other than the one at issue in *Weaver*, 'whether the result should be any different if the errors were raised instead in an ineffective-assistance claim on collateral review,' as is the case here." *Id. See also State v. Grunwald*, 478 P.3d 1, *7 (Utah 2020) (stating that "[i]n the past we have suggested that we may presume prejudice where there were errors in a jury instruction related to an essential element of a crime[,]" "[b]ut in our recent *State v. Garcia* decision, we clarified that, where an error in a jury instruction is alleged, we must conduct the full analysis required under *Strickland*'s prejudice prong.").

[18] *Strickland*, 466 U.S. at 696.

[19] *See, e.g., Bullock*, 775 A.2d at 1055 (Veasey, C.J., concurring) (noting "the imperative that a jury be given clear and correct guidance[,]" and that, "[a] defendant is 'entitled' to a 'correct statement of the substance of the law.'") (quoting *Grace v. State*, 658 A.2d 1011, 1014 (Del.

the amendment to the felony-murder statute stated in its synopsis that the amendment was intended to make the application of the felony-murder law "more readily understood and consistent."[20] This is an acknowledgement that the area of felony-murder law is indeed complex, especially when applied in a case where the jury must consider nuanced distinctions between principal and accomplice liability and the broad scope of criminal liability under the felony-murder statute.

Here, where the jury instructions relate to a felony-murder charge carrying the potential for a life sentence, where the trial court gives a substantively and materially incorrect statement of the felony-murder statute to the jury, and where both trial counsel and the court fail to notice, perhaps there should be a rebuttable presumption of prejudice. As we have noted, the prejudice prong of *Strickland* is an "arduous standard" for a defendant to meet.[21] It strikes me as unfair to add to a defendant's already arduous burden the task of speculating on all the ways the substantively incorrect felony-murder jury instruction might have negatively affected the outcome of the case.

What does the typical prejudice analysis require? Perhaps here it is as simple as the Majority suggests – the incorrect, outdated instruction actually enhanced the burden for the

---

1995)); *id*. at 1058 (Chief Justice Veasy observing that "the 'enormous difficulty' sometimes engendered by this [legal issue of first impression being considered on appeal], combined with the fact that it is one of first impression in this Court in a serious criminal case, tips the balance toward a finding of plain error in this case because the instruction lacked essential clarity and was not a correct statement of the law.").

[20] 74 Del. Laws. Ch. 246, synopsis (2004).

[21] *Kent v. State*, __ A.3d __, 2025 WL 952065, at *8 (Del. Mar. 31, 2025) (quoting *Cooke v. State*, __ A.3d __, 2025 WL 16395, at *25 (Del. Jan. 2, 2025)) ("*Strickland*'s second part – the prejudice prong – presents another arduous standard.").

State, and thus, Kellam cannot demonstrate prejudice, and because the state proceeded on an accomplice liability theory and an accomplice liability instruction was given, *Ray* is distinguishable. But even in *Ray*, our Court appeared to recognize an aspect of prejudice apart from the "potential new path to conviction" prejudice. In *Ray*, we stated that "[t]he jury instruction was likely to have an adverse effect on the jury's understanding of felony murder as defined by 11 *Del. C.* § 636 (a)(2) for several reasons."[22] We then said, "[f]irst—and most obviously—the instruction as actually given did not accurately track the elements of the offense as defined by the then-operative statute."[23] We observed that the instruction was erroneous on a second level as it incorrectly explained "in furtherance of" even under the pre-2004 statute.[24] It was only *after* that discussion that we said, "[t]he instruction also improperly cleared a new path to a finding that Ray was guilty of first-degree murder."[25]

The Utah Supreme Court's decision in *State v. Grunwald*[26] suggests a more nuanced approach that appears to attempt to address more directly whether the jury instruction was likely to have an adverse effect on the jury's understanding of the charge. There, that court held that trial counsel's deficiency in failing to object to three errors in jury instructions on accomplice liability prejudiced the defendant. In framing the prejudice analysis under *Strickland*'s second prong, the court stated:

---

[22] *Ray*, 280 A.3d at 644.

[23] *Id*. In *Lloyd*, this Court observed that, "[a]n instruction which tracks the statutory language is adequate to inform the jury." *Lloyd*, 152 A.3d at 1271.

[24] *Ray*, 280 A.3d at 644.

[25] *Id*.

[26] 478 P.3d 1 (Utah 2020).

When applying *Strickland*'s prejudice analysis in the context of erroneous jury instructions, we must determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct. A reasonable probability "is a probability sufficient to undermine [our] confidence in the outcome." To determine whether there is a reasonable probability of a different outcome, we must ask ourselves two questions: (1) did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings that would not have led to conviction had the instructions been correct? and, (2) if so, is there a *reasonable probability* that at least one juror based its verdict on those factual findings?"[27]

This is a tall order to satisfy for any defendant when a jury is improperly instructed.

We have recognized, in other cases involving serious claims of ineffective assistance of counsel, that it is unfair to place the burden on the defendant to demonstrate prejudice. In *Urquhart v. State*,[28] a case where trial counsel failed to meet with the defendant to prepare for trial, we noted that the appeal had "elements of both a *Cronic* and a *Strickland* violation."[29] We held that:

Under the stark facts in this appeal—no advance discussion with Urquhart of trial strategy, what witnesses to call, how to respond to the State's evidence, whether the defendant should testify, and no sober conversation with counsel outside the distractions of the morning of trial whether to enter into plea negotiations and accept a plea—the defendant should not have to point to any specific event of prejudice and disprove the State's contention that trial counsel was able to "wing it" enough at trial to satisfy the Sixth Amendment. As the Supreme Court said in *Cronic*, some situations "ma[k]e it so unlikely that any lawyer could provide effective assistance that ineffectiveness [i]s properly presumed without inquiry into actual performance at trial."[30]

---

[27] 478 P.3d at *7 (internal citations omitted).

[28] 203 A.3d 719 (Del. 2019).

[29] *Id.* at 732.

[30] *Id.*

And we then observed that "[e]ven if specific prejudice need be shown, under a *Strickland* analysis trial counsel's pretrial ineffectiveness prejudiced Urquhart in plea negotiations. . . . Because the prejudice is manifest from the record, in the interest of justice, we will consider prejudice under *Strickland*."[31] We then found that the prejudice was "obvious."[32]

I think that the nature of the error here, where the court misstated an essential element of the felony-murder statute by confusingly referring to both the pre- and post-2004 elements in the same instruction, the complexity of this area of the law, and the gravity of the charge put the defendant here in a similar hard place. The defendant is forced to evaluate and predict juror behavior in response to the erroneous instruction, and to consider a myriad of theoretical factual scenarios in which the incorrect instruction might have permitted the jury to impermissibly convict him.[33] As the *Grunwald* court noted, "a 'proper analysis also needs to focus on the evidence before the jury and whether the jury could reasonably have [made factual findings] such that a failure to instruct the jury properly undermines confidence in the verdict.'"[34] That is why in this case, I think there should be a rebuttable presumption of prejudice requiring the State to then demonstrate an absence of prejudice under *Strickland*.[35] Perhaps that might be one way to reconcile our

---

[31] *Id*. at 732–33.

[32] *Id.* at 733.

[33] *See Grunwald*, 478 P.3d at *7.

[34] *Id*. at *8 (citation omitted).

[35] Placing the burden of a rebuttable presumption on the State does not make sense when a defendant's trial counsel's errors do not implicate any conduct by the State. But I do think that when it comes to reviewing and approving the jury instructions as they relate to stating the essential

51

"unqualified right" language in *Ray* – which the Majority leaves untouched – with the notion that a prejudice analysis should be conducted.

In this unusual case, I agree with the State and the Majority that part of the error increased the State's burden of proof as to the felony-murder charge and arguably benefited the defendant. But I am also uncertain as to whether simply asking whether the State's burden was ultimately heavier should be the end of the analysis. Asking a defendant to bear the "arduous" burden of explaining how a jury instruction, which is wrong on two levels (as was the case in *Ray*), prejudiced him penalizes the defendant for mistakes for which both the trial court and the State also bear some responsibility. In this case, it is hard to ascertain whether and how the jury's findings may have been impacted after being given a legally incorrect framework in which to evaluate them. Although the mixing of the elements in a single instruction could have caused confusion, my review of the record reveals that no juror asked questions about this particular instruction.[36] And unlike some cases like *Ray* where the prejudice is obvious, I am unable to articulate how Kellam

_____

elements of the offenses charged, it is not unfair to assume the State shares the responsibility for the accuracy of the instructions in stating the essential elements of the offenses. *See, e.g., Moore v. Rivello*, 2022 WL 1749250, at *11, *17 (E.D. Pa. May 31, 2022) (commending the Commonwealth for conceding that the reasonable doubt instruction at issue in the case was unconstitutional and that the defendant suffered prejudice as a result); *see also Hunter v. State*, 815 A.2d 730, 735 (Del. 2002) (quoting *Sexton v. State*, 397 A.2d 540, 544 (Del. 1979)) ("The law in this area is well settled. The prosecutor 'represents all the people, including the defendant' and must 'seek justice, not merely convictions.'"); *Seth v. State*, 592 A.2d 436, 442 (Del. 1991) (quoting *Hughes v. State*, 437 A.2d 559, 566 (Del. 1981)) ("Defendant correctly notes that it is the responsibility of a prosecutor to 'seek justice, not merely convictions.'").

[36] The jury did ask one question about the racketeering charge. *See* Transcript of Proceedings at K-6, lines 1–4 (Sept. 25, 2017) (inquiring as follows: "Please explain on Page 38, Item (c), what is meant by the State must show that the enterprise had an existence beyond that which is necessary to commit each of the acts charged.").

suffered prejudice. Accordingly, although I think a rebuttable presumption of prejudice is appropriate in this case, I concur with the Majority's result in reversing the judgment as to the State's cross-appeal because even were such a presumption to be applied here, I still see no prejudice that justifies a different result.